UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


NELSON FERRIER,                          )
                                         )
            Plaintiff,                   )
                                         )
        v.                               )       No. 2:04 CV 18 SNL
                                         )                        DDN
JO ANNE BARNHART,                        )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Nelson Ferrier for disability benefits under
Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, <u>et seq.</u>
The action was referred to the undersigned United States Magistrate
Judge for a recommended disposition under 28 U.S.C. § 636(b).


**I.  BACKGROUND**

**A.   Plaintiff's Application and Medical Records**

In November 2001, plaintiff, who was born in 1953, applied for
disability benefits alleging he became disabled on March 12, 1998.[1]
Plaintiff alleges he is unable to engage in substantial, gainful
employment due to problems with balance, ambulation, numbness in
extremities, and pain.  (Tr. 78-79, 92, 152-54.)

Plaintiff's most recent work was as a taxicab driver from January
to March 1998.  Plaintiff reports that he was unable to continue this
work "due to immobility, pain, and not able to cope with the lack of
capability of doing prior tasks that [were] once a lifestyle."  Prior
to this position, plaintiff worked in a plastics factory from December
1996 until May 1997; as a traveling tools salesman from March until

---

[1]Plaintiff applied for disability benefits in August 2000, but was
denied in October 2000.  (Tr. 57-58.)

- 1 -

November 1996; as a golf course grounds keeper from 1990 to 1995; as a bartender from 1989 to 1990; and as an electrician's helper from 1985 to 1989.  (Tr. 184-85.)

Plaintiff's wage history during this employment is as follows:

| 1985 | $    0.00 | 1992 | 10,487.89 |
|------|-----------|------|-----------|
| 1986 |      0.00 | 1993 | 10,978.80 |
| 1987 |      0.00 | 1994 | 11,664.71 |
| 1988 | 2,755.19  | 1995 | 5,116.46  |
| 1989 | 6,538.82  | 1996 | 4,004.00  |
| 1990 | 8,051.25  | 1997 | 2,759.82  |
| 1991 | 9,360.61  |      |           |

(Tr. 129.)

During a November 30, 2001, SSA interview with plaintiff, interviewer E. Thompson noted that plaintiff had no difficulty with hearing, breathing, understanding, coherency, concentrating, talking, answering, or using his hands and writing.  Thompson observed plaintiff had difficulty reading, sitting, standing, walking, and seeing. Narratively, he observed plaintiff had difficulty reading because he did not have his reading glasses during the interview, and that plaintiff appeared to be in pain.  (Tr. 195.)

In December 2001, plaintiff completed two Claimant Questionnaires and a supplemental questionnaire.  Plaintiff reports that he has a stiff neck, is unable to look upward without losing his balance, experiences numbness in both hands, loses balance when walking, has one leg two inches shorter than the other leg, has occasional hip pain, and has an impaired left knee.  Plaintiff states this pain occurs constantly, even when he is sleeping, and is made worse by movement and activity.  He drinks alcoholic beverages to relieve the pain.  His medications

include: Tylenol,[2] four tablets three to six times per day; Aleve,[3] four tablets three to six times per day; and beer, four to 24 cans per day. Plaintiff reports side-effects from these medications include limited driving. Plaintiff stated he has no money for medications. (Tr. 175.)

Plaintiff reports that his impairments limit his daily activities. Plaintiff states that "sleep is a luxury that is not a peaceful or restful sleep unless intoxicated." Plaintiff further reports that he takes an extended time for self-grooming, he has difficulty shaving, and he cannot reach to cut his toenails. Plaintiff states that he is unable to stand long enough to cook a meal due to severe pain. Plaintiff mainly eats sandwiches and microwaveable meals. Plaintiff does not go to the grocery store or otherwise shop due to constant pain, severe hip pain in the winter, and temporary paralysis when the weather is cold. Occasionally, plaintiff's sister assists him with shopping. (Tr. 176.)

With respect to household activities, plaintiff reports that he is able to empty an ash tray and take care of his personal grooming, and he receives occasional assistance from friends and family. Plaintiff reports he enjoys horseshoes, hunting, and fishing. However, he is prohibited from or limited in these activities due to pain and difficulties with balance. Plaintiff watches television, but reports he is unable to sit for a period of time without experiencing numbness. Plaintiff is able to drive, but reports he needs to stop frequently and can only drive an automatic automobile. Plaintiff states he occasionally visits friends and family and goes to the Moose Lodge. Plaintiff leaves his home approximately three to five times per week.

---

[2]Tylenol (acetaminophen) is used "[f]or the temporary relief of minor aches and pains associated with headache, muscular aches, backache, minor arthritis pain, common cold, toothache, menstrual cramps and for the reduction of fever." Physician's Desk Reference, 1832 (55th ed. 2001).

[3]"Aleve is in a class of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs)." "Aleve is used to reduce pain, inflammation, and stiffness caused by many conditions, such as osteoarthritis, rheumatoid arthritis, gout, ankylosing spondylitis, injury, abdominal cramps associated with menstruation, tendinitis, and bursitis." http://www.drugs.com/aleve.html (last visited August 8, 2005).

When he leaves, plaintiff reports pain, tiring easily, and difficulty navigating steps. (Tr. 176-77.)

Socially, plaintiff reports that people do not understand his constant pain and discomfort and his need to stay home. Plaintiff believes this limits his social life and ability to engage in meaningful relationships. Plaintiff does not have a phone, reportedly due to limited finances and the fact that he cannot use a phone "with ease." (Tr. 178.)

Plaintiff reports that he can sit for 20 to 30 minutes at a time needing to stretch frequently to prevent numbness. With regard to standing, plaintiff can stand for approximately five to ten minutes due to pain and lack of balance. Plaintiff reports being able to walk for two to three minutes to use the bathroom or walk to his automobile. Plaintiff reports he can lift less than ten pounds due to pain and a lack of arm strength. Plaintiff can only use his hands for a few minutes at a time due to pain in his shoulders and numbness in his hands. Plaintiff reports he cannot bend, reach overhead, or climb stairs due to a lack of balance, and he cannot kneel or squat after having a portion of his knee cap removed. Plaintiff cannot reach forward due to pain in his neck and lower back. (Tr. 174.)

On March 26, 1979, plaintiff was involved in a motorcycle accident that left him with a fracture of the left clavicle and a fracture of the left distal femur. Plaintiff underwent surgery for open reduction and fixation with a plate on his left femur. While his clavicle healed well, plaintiff's plate pulled out of the fractured femur resulting in severe pain. Plaintiff continued with numerous post-surgery treatments for the fractured femur and subsequent infections at the site, including draining abscess fluids, x-rays, antibiotics, hyperbaric oxygen treatment, and a 2-inch heal lift to help with ambulation. (Tr. 469-99).

From August 4, 1980, until October 1, 1991, James Heckman, M.D., followed plaintiff for treatment. Dr. Heckman eventually recognized a general continual improvement of movement, though plaintiff still had a substantial loss of function. Plaintiff was last seen by Dr. Heckman on October 1, 1991. (Tr. 469-99.)

On March 12, 1998, plaintiff was admitted to Boone Hospital Center following a motor vehicle accident where he was rear-ended by a large truck while driving in a small car. Charles Bondurant, M.D., was the treating physician from this incident until October 13, 2000. After the incident, plaintiff reported numbness and tingling in his hands and some weakness in his lower extremities. In addition, Dr. Bondurant found that plaintiff had a rather prominent stenosis,[4] most pronounced at the C4-5, C5-6 and C6-7 levels, and further noted that plaintiff is likely to have some C2 cord damage. Plaintiff was discharged on March 15, 1998, with a diagnosis of: history of illicit drug use; history of chronic osteomyelitis;[5] history of hypertension; central cord syndrome[6] from cervical spondylotic encroachment; and history of ethanol abuse. Dr. Bondurant recommended that plaintiff not lift anything other than

---

[4]Stenosis is "[a] stricture of any canal . . . ." Stedman's Medical Dictionary, 1473 (25th ed. 1990).

[5]Osteomyelitis is "inflammation of the bone marrow and adjacent bone." Id. at 1109.

[6]    Central cord syndrome is a form of incomplete spinal cord injury (in which some of the signals from the brain to the body are not received), characterized by impairment in the arms and hands and, to a lesser extent, in the legs. The brain's ability to send and receive signals to and from parts of the body below the site of trauma is affected but not entirely blocked. This syndrome, usually the result of trauma, is associated with damage to the large nerve fibers that carry information directly from the cerebral cortex to the spinal cord. These nerves are particularly important for hand and arm function. Symptoms may include paralysis and/or loss of fine control of movements in the arms and hands, with relatively less impairment of leg movements. Sensory loss below the site of the spinal injury and loss of bladder control may also occur, with the overall amount and type of functional loss dependent on how severely the nerves of the spinal cord are damaged.

National Institute of Neurological Disorders and Strokes, http://www.ninds.nih.gov/disorders/central_cord/central_cord.htm (last visited August 8, 2005).

his shoes or anything heavier than a phone book, in addition to wearing a cervical collar.   A March 13, 1998, Magnetic Resonance Imaging (MRI) of plaintiff's cervical spine showed early degenerative changes and was otherwise normal.  (Tr. 338, 344, 408, 411, 419, 423-24, 427.)

At a three-week follow-up appointment, plaintiff reported residual paresthesias[7] in the fourth and fifth digits of his right hand, and Dr. Bondurant noted slow progress with the apparent central cord injury. At a six-week follow-up, Dr. Bondurant suggested a disk space decompression of plaintiff's cervical spine and asked plaintiff to consider the operation.  At another follow-up after the accident on May 29, 1998, Dr. Bondurant again recommended anterior cervical decompression and the potential risks and benefits were discussed.  At this appointment, plaintiff asked whether he may return to driving, and Dr. Bondurant stated that he did not detect a reason not to, though he suggested the plaintiff practice driving first in a parking lot.  On a July 31, 1998, follow-up appointment, plaintiff described himself to be "faring for the most part well" and indicated that he was driving his cab.  Even though plaintiff seemed to have fared for the most part "well after an apparent central cord injury after a motor vehicle accident," Dr. Bondurant continued to recommend the anterior cervical decompression operation.  (Tr. 358-60, 362.)

On August 18, 1998, plaintiff was admitted to Boone Hospital for spinal surgery.  The records show that plaintiff smoked approximately one or two packs of cigarettes per day and drank between six to 24 beers per day.  During his admission, plaintiff was treated with Ativan IV to cope with his alcohol withdrawal.   On August 18, 1998, plaintiff underwent a successful surgery of C4-C5 corpectomy with C3-C6 iliac crest strut grafting and Synthes plate placements.  By August 24 "he was up and about, and feeling quite well. He was afebrile. His wounds were nonreactive. . . ."  Plaintiff was discharged on August 28, 1998, with instructions for care that included wearing a cervical collar at all times and avoiding lifting anything heavier than ten pounds.   His discharge diagnosis included: history of illicit drug abuse; history of

---

[7]Parasthesia is "an abnormal sensation, such as of burning, pricking, tickling, or tingling."  Stedman's at 1140.

chronic osteomyelitis, left lower extremity; history of hypertension; ethanol abuse; tobacco abuse; and cervical spondylotic myelopathy with central cord syndrome. (Tr. 384-85, 387-88, 391, 394-97.)

After several follow-up appointments, Dr. Bondurant allowed plaintiff to generally increase his activities and to be weaned off his collar over the next month, though plaintiff still reported discomfort. After four and a half months, Dr. Bondurant reported that plaintiff seemed to be "for the most part well after cervical corpectomy, fixation and fusion," though plaintiff reported occasional aching discomfort in his left shoulder with parasthesias in his left hand when he slept on his side. During a later follow-up in April 5, 1999, about 8 months after his surgery, plaintiff reported little if any cervical discomfort, though he still had residual parasthesias in the fifth digit of his right hand. At this appointment, Dr. Bondurant opined that plaintiff was fairing well for the most part, and he decided that plaintiff no longer needed to schedule regular follow-up appointments. (Tr. 353-55.)

Edwin Carter, M.D., evaluated plaintiff on May 3, 2000. Plaintiff complained of neck aches that sometimes woke him up, lower back aches that were more pronounced after sitting for a period of time, and numbness in four fingers of his right hand and index finger of his left. Dr. Carter noted that plaintiff's left leg was about four centimeters shorter than the right and that there appeared to have been some drainage near the left knee area. At this evaluation, plaintiff stated that he did not want to go back to work because of financial problems even though he knew that Dr. Bondurant said he could return to work and he himself felt he could return to work. Examination of plaintiff's head revealed no pain, pressure, or deformity. Examination of the cervical spine revealed no tenderness or muscle spasm, near normal range of motion, and no pain. Plaintiff exhibited normal range of motion and a lack of pain in his upper extremities. Examination of the dorso-lumbar spine was essentially normal and without pain, except for scoliosis. Plaintiff's lower extremities showed the ability to straight leg raise while sitting without pain in both legs. However, plaintiff was limited in his ability to ambulate and move his left leg. (Tr. 373-77.)

Dr. Carter concluded that plaintiff had significant other residual disability from his left femoral problems, left knee, and right clavicle and that his gait "showed a severe limp on the left." Also, Dr. Carter opined that plaintiff was about 30 percent permanently disabled stemming from the cervical spine fusion and that he was approximately 75 percent permanent, partially disabled in his lower left extremity. Taken as a whole, Dr. Carter approximated that plaintiff was about 68 percent of a man as a whole with up to a ten percent increase as a whole in disability stemming from the multiplicity of disabilities. Despite these findings, Dr. Carter opined that plaintiff had reached maximum medical improvement from the March 12, 1998, accident and subsequent surgeries, and that while plaintiff continued to report minor symptoms in both hands, Dr. Carter noted no related, objective findings. Dr. Carter found that plaintiff could likely drive a taxicab again, though his left leg and other disabilities would "preclude many jobs in the open market." (Tr. 373-74, 376, 378.)

On December 12, 2001, plaintiff was seen for a disability physical by Michael Quinlan, M.D. In this examination, plaintiff has a very limited range of motion in his neck; numbness in both hands, but he adapted and uses his hands appropriately; a decreased grip strength, though it had not caused him to drop any objects; and limited mobility due to left knee dislocation and inability to control leg movement below his left knee. Plaintiff reported loss of balance and that, when his eyes are closed, he has trouble keeping his balance and he gets dizzy when he leans his head backwards. While he could walk, plaintiff felt uncomfortable on uneven surfaces and had difficulty climbing stairs due to a lack of control over his left lower extremity. However, he could still drive because his lower right extremity was not limited. Plaintiff did not mention any problems with sitting for prolonged periods, but he did report having trouble standing for prolonged periods because he held most of his weight on his right leg. Dr. Quinlan reported that plaintiff's gait was severely compromised but that he did not use an assistive walking device. Plaintiff was also unable to

squat.  Plaintiff reported frequently taking ibuprofen [8] and Tylenol for chronic joint and bone pain.  (Tr. 345-51.)

Dr. Quinlan ultimately concluded that plaintiff had severely limited walking, problems with range of motion in his neck, and poor balance.  Accordingly, he opined plaintiff would be unable to perform most jobs that required standing or frequent ambulation.  (Tr. 348.)

On March 20, 2002, plaintiff admitted himself to the hospital for evaluation because he was bedridden due to severe weakness stemming from several months of increasing abdominal girth and fatigue.  Steven Taylor, M.D., was plaintiff's treating physician for this hospital admission.  In subsequent tests on March 21, 2002, Dr. Taylor discovered a large left pleural effusion,[9] a large amount of ascites,[10] cirrhosis of the liver, and small patches of infiltrates in the right upper lung.  Computed Tomography (CT) scans showed a lack of mass lesions in the chest, abdomen, or pelvis.  The next day, during a consulting physical examination, Dr. Quinlan found that plaintiff's abdomen had marked swelling and positive fluid waste.  Three liters of fluids were drained from the upper lobe of the left lung.  By the end of the treatment, plaintiff diuresed at least 20 pounds of weight with the help of the medicine Spironolactone.[11]  Plaintiff was continued on a diuretic and

---

[8]"Ibuprofen is used to relieve the pain, tenderness, inflammation (swelling), and stiffness caused by arthritis and gout. It is also used to reduce fever and to relieve headaches, muscle aches, menstrual pain, aches and pains from the common cold, backache, and pain after surgery or dental work."  Medline Plus at http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/a682159.html (last visited July 20, 2005).

[9]Pleural Effusion is an escape of fluid from the "serous membrane enveloping the lungs and lining the walls of the pleural cavity." Stedman's, at 491, 1215.

[10]Ascites is the accumulation of serous fluid in the peritoneal cavity.  Stedman's, at 140.

[11]"Spironolactone, a 'water pill,' is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to eliminate unneeded water and salt from the body into the urine."  Medline Plus at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6826 27.html#why (last visited August 8, 2005).

given Darvocet[12] as needed for pain.  Dr. Taylor noted on the discharge summary that plaintiff's ascites was caused by his "6-12 cans of beer per day habit."  (Tr. 264, 269, 271, 278, 291.)

On March 26, 2002, plaintiff was discharged and he reported feeling better.  Upon discharge, Dr. Taylor diagnosed plaintiff as follows:

1. Cirrhosis with massive ascites and associated left pleural effusion.
2. Hepatitis C noted on the hepatitis panel
3. Alcoholism
4. Chronic obstructive pulmonary disease
5. Nicotine dependence
6. Family history of hypertension and colon cancer
7. Rectal bleeding by history
8. Umbilical hernia probably secondary to the ascites
9. Status post multiple surgeries

(Tr. 264-65.)

On April 3, 2002, a week after his hospital discharge, plaintiff saw Dr. Quinlan.  Plaintiff seemed to be doing much better.  He reported no shortness of breath, and Dr. Quinlan opined that plaintiff appeared to be getting along a lot better.  Dr. Quinlan also noted that plaintiff's pleural effusion appeared to have resolved, that plaintiff had abstained from alcohol for two weeks, and that plaintiff still exhibited ascites.  (Tr. 210.)

On April 4, 2002, Dr. Quinlan filed a "Medical Report Including Physician's Certification/Disability Evaluation."  In it, Dr. Quinlan opined that plaintiff was "unable to work" due to a combination of his previous "crippling" lower extremity injury, cirrhotic liver disease, pleural effusion, ascites, and Hepatitis B and C.  It was Dr. Quinlan's opinion that plaintiff's impairments permanently prevented him from employment.  (Tr. 249-50.)

On May 3, 2002, at another follow-up appointment, Dr. Quinlan noted that plaintiff was growing breast buds.  Plaintiff reported no shortness of breath, no change in his abdomen, and Dr. Quinlan reported that

---

[12]Darvocet is "indicated for the relief of mild to moderate pain . . . ."  Physician's Desk Reference (PDR), 1709 (55th ed. 2001).

plaintiff's Hepatitis B and C were inactive. Dr. Quinlan concluded that plaintiff began developing gynecomastia,[13] and he changed medicines from Spironolactone to Lasix[14] in hopes of controlling the symptoms. Even with the change in medicine, Dr. Quinlan noted on July 10, 2002, that plaintiff still had gynecomastia and breast tenderness. (Tr. 211-12.)

On September 4, 2002, plaintiff reported that he was in a vehicle accident that occurred a week and a half earlier. Dr. Quinlan noted that plaintiff was barely able to lift his left arm about 30-40 degrees, and that he had severe bruising over his left shoulder and left ribs. Plaintiff exhibited full range of motion in his neck, with no cervical spine tenderness. X-ray scans revealed that plaintiff had a fracture of the distal acromion without significant displacement and fractures of the left fourth, fifth, sixth, and seventh ribs. Dr. Quinlan noted plaintiff was hypertensive and reported to be in pain. For the pain, Dr. Quinlan prescribed Percodan[15] without any refills. (Tr. 213, 328-29.)

On September 13, 2002, plaintiff was seen by David Rispler, M.D. At the time of this visit, plaintiff was taking Lasix and Percocet.[16] Examination revealed plaintiff had good range of motion and motor strength in his cervical spine, with some pinpoint tenderness. X-ray examination revealed fractures in his shoulder and two ribs. Dr. Rispler recommended range of motion exercises and pain medication

---

[13]Gynecomastia is the "[e]xcessive development of the male mammary glands, due mainly to ductal proliferation with periductal edema . . . ." Stedman's at 676.

[14]Lasix, otherwise known as "Furosemide, [is] a 'water pill,' is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. It is also used to treat high blood pressure. It causes the kidneys to get rid of unneeded water and salt from the body into the urine." Medline Plus at http://www.nlm.nih.gov/medlineplus/druginfo /medmaster/a682858.html#why (last visited August 8, 2005).

[15]Percodan is indicated "[f]or the relief of moderate to moderately severe pain." PDR at 1212.

[16]Percocet "is indicated for the relief of moderate to moderately severe pain." Id. at 1211.

finding that plaintiff's fractures would heal with conservative care. (Tr. 199-201.)

At a follow-up appointment on October 18, 2002, Dr. Quinlan noted that plaintiff still had a lot of pain from his broken collar bone and ribs, though his range of motion did improve. Plaintiff was prescribed another month of Percodan. Dr. Quinlan noted that plaintiff's ascites had not been an issue for sometime, so he discontinued plaintiff's diuretic. However, plaintiff still had cirrhotic liver disease, and chronic Hepatitis B and C. (Tr. 215.)

On the same day, Dr. Quinlan opined that, since plaintiff was even more limited in his ability to work than he was one year prior, plaintiff "certainly qualifies for permanent disability at this time." Dr. Quinlan cited the following as the change in plaintiff's condition: "Since that time the patient has been diagnosed with Hepatitis B and C which have led to liver disease requiring diuretics to control ascites and effusion. He has also had pleural effusion which had to be drained secondary to the ascites." (Tr. 208.)

On December 10, 2002, Dr. Quinlan completed a "Medical Source Statement--Physical." Dr. Quinlan opined that plaintiff would be able to frequently or occasionally lift and carry 20 pounds. Further, he opined that plaintiff would be able to stand or walk about four hours per workday but not continuously for more than 30 minutes. As for sitting, Dr. Quinlan opined that plaintiff could sit for four hours out of an eight-hour workday and continuously for one hour. Dr. Quinlan concluded that plaintiff's medical symptoms would render him unable to perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances. In addition, Dr. Quinlan stated that plaintiff would be unable to complete a normal workday and workweek without interruptions from medically based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff would need approximately five to six rest periods per day for 20 to 30 minutes at a time. Plaintiff was limited in his ability to push and pull because of a prior shoulder fracture. He could occasionally climb, balance, stoop, kneel, crouch and crawl. He was limited in his ability to reach and handle things because of loss

of strength in his arms and legs.  He was unable to straighten his left leg and had difficulty ambulating.  (Tr. 203-07.)

The record contains a handwritten, undated, unsigned "Physical Residual Functional Capacity Assessment."  The assessment provides that plaintiff is able to occasionally lift 20 pounds, frequently lift ten pounds, stand or walk at least two hours in an eight-hour day, sit about six hours in an eight-hour day, and is limited in his lower extremities with regard to pushing and pulling.  Plaintiff can occasionally climb a ramp or stairs, stoop, kneel, crouch or crawl, and can never climb a ladder, rope or scaffold, or balance.  The assessment further states that plaintiff is unlimited in his ability to reach, handle, finger and feel, and has no visual or communicative limitations.  Plaintiff should avoid concentrated exposure to vibrations, but has no other environmental limitations, including the ability to work around machinery and at heights.  The assessor opined that plaintiff's allegations are somewhat credible; however, he is capable of engaging in sedentary activity.  (Tr. 161-68.)

The handwritten assessment differs in some respects from a type-written "Physical Residual Functional Capacity Assessment" completed by Disability Examiner Lisa Stone on October 24, 2000.  This assessment does not indicate whether Lisa Stone is a medical provider, and in fact the pre-printed signature block stating "Medical Provider's Signature" is crossed out indicating Lisa Stone is likely not a physician.  (Tr. 61-68.)

## B.  Plaintiff's Hearing Testimony

The ALJ conducted a hearing on December 11, 2002, at which plaintiff was represented by counsel.[17]  Plaintiff testified that he is divorced and lives alone in a house.  Plaintiff completed school through 2 years of junior college.  He testified that his monthly income comes from "general relief" payments through the Department of Human Services and food stamps.  Plaintiff has a Medicaid card for health benefits.

---

[17]An SSA Vocational Expert (VE) was also present at the hearing. He was not, however, asked to testify.  (Tr. 26.)

He testified he spends most of his day watching television or movies, and he spends his evenings at the Moose Lodge playing cards and games. One time per month, plaintiff visits his friend in the country. (Tr. 26-29, 44.)

Plaintiff testified that he was receiving Social Security Disability from 1983 to approximately 1988 after a motorcycle accident where he almost lost his leg. Plaintiff testified that he believes disability payments ceased because he failed to attend a re-hearing evaluation. Plaintiff further testified that "at that point in my life, I just felt like I needed for my own sanity to go back to work." (Tr. 40-41.)

With regard to his work history, plaintiff testified that he last worked in March 1998 as a taxi driver; he stopped working after he was in an automobile accident. Plaintiff received a settlement from the accident. He testified that the amount he received was less than $6,000 after attorney's fees, but he could not remember the exact figure. Prior to that, plaintiff worked in a plastics factory for approximately six months until it went out of business. (Tr. 31-36, 45-48.)

Plaintiff testified that he has been seeing his family doctor, Dr. Quinlan, since March 2002. Plaintiff originally saw Dr. Quinlan monthly, but at the time of the hearing he was seeing him every three months. In September 2002, plaintiff was injured in an ATV accident while camping with friends. Plaintiff testified he still has pain and swelling in his knee from a motorcycle accident, as well as a drain in the knee to prevent the spread of any potential infection. Plaintiff also testified he has pain in his hip because his left leg is shorter than the other leg. Plaintiff walks with a cane for balance. Plaintiff testified that his lower back aches "90 percent of the time . . . basically all the time." The pain occurs without regard to physical position. However, it is more prevalent when plaintiff is standing for long periods of time. Plaintiff was unable to describe how long he could stand, but expected it would be no more than five minutes. Plaintiff further was unable to testify as to how much he could lift, but believed he would have difficulty lifting due to his shoulder and knee. Plaintiff testified that he experiences discomfort when sitting

for a period of time unless he is in a reclining position.  Plaintiff spends approximately 25 percent of his day in a recliner.  (Tr. 32, 40-44.)

Plaintiff testified that he has a history of illegal drug use.  However, he has not used illegal narcotics since the 1980s.  Currently, he drinks about a six-pack of beer every evening to help fall asleep, as well as smokes about half a pack of cigarettes daily.  Plaintiff testified he has difficulty sleeping due to pain.  (Tr. 37-38, 45.)

## C.    The ALJ's Decision

In the decision denying benefits, the ALJ found plaintiff was not disabled within the meaning of the Social Security Act.  The ALJ noted that plaintiff previously filed an application for disability benefits in August 2000 and was denied in October 2000.  The ALJ determined there was no new and material evidence requiring he reopen plaintiff's first application; thus, he proceeded to address the merits of the instant application for benefits.  (Tr. 12.)

The ALJ reviewed plaintiff's medical records from March 1998 to December 2002.  He determined that "the medical evidence show[ed] that the [plaintiff] has impairments of:  crippled lower left extremity associated with earlier fracture of left femur and multiple related surgeries, cirrhotic liver disease, ascites, hepatitis B, hepatitis C, and pleural effusion; which in combination, cause significant limitations in his abilities to perform work related activities."  The ALJ characterized these impairments as severe and more than minimally affecting his ability to work.  Despite this finding, the ALJ concluded that the medical findings do not meet or equal, solely or in combination, the requirements for a Listing impairment.  (Tr. 14-17.)

Regarding plaintiff's credibility, the ALJ found his subjective complaints of impairments were not fully credible.  The ALJ based this finding on the facts that plaintiff began employment shortly after it was previously determined his disability status ceased, that medical provider opinions do not preclude all possible work, that plaintiff has been given no provider-imposed restrictions except not to lift more than ten pounds, that a provider opined plaintiff could likely drive a

taxicab again, that plaintiff has given inconsistent statements, and that plaintiff has not taken continued, strong pain medication. Regarding plaintiff's activities of daily living, the ALJ found that his ability to watch television at least 25 percent of the day, play games at the Moose Lodge nightly, ride ATVs, and camp and fish belied his inability to sit for extended periods of time.[18]   (Tr. 18-21.)

The ALJ concluded plaintiff had the RFC to perform work related activities excluding lifting or carrying more than ten pounds or standing and walking more than two hours in an eight-hour day.  The ALJ found plaintiff was not limited in his ability to sit.  Reviewing plaintiff's past, relevant work as a taxicab driver, the ALJ noted that plaintiff reported he sat for nine hours a day, and he was not required to lift more than ten pounds.  Ultimately, the ALJ determined that plaintiff could return to his work as a taxicab driver based on the demands of the position as plaintiff described.  (Tr. 21-22.)

The Appeals Council declined further review.  Hence, the ALJ's decision became the final decision of defendant Commissioner subject to judicial review.  (Tr. 2-4.)

In his appeal, plaintiff argues that the ALJ's Residual Functional Capacity (RFC) determination is not supported by substantial evidence. (Doc. 19.)

## II.  DISCUSSION

### A.  General Legal Framework

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir. 2003).  In determining whether the evidence is

_____

[18]The ALJ also weighed plaintiff's previous employment and wage history as a factor in determining credibility.  The ALJ ultimately found that this history neither supported nor detracted from plaintiff's credibility.  (Tr. 21.)

substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision.   See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003).   So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently.   See Krogmeier, 294 F.3d at 1022.

To be entitled to benefits on account of disability, a claimant must prove that he is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months.   See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004).   A five-step regulatory framework governs the evaluation of disability in general.   See 20 C.F.R. §§ 404.1520, 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).   If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached.   20 C.F.R. § 404.1520(a)(4).

The claimant has the burden of showing that he is unable to perform his past relevant work.   Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).   If he is able to perform his previous work, he is not disabled, 20 C.F.R. §§ 404.1520(f), 416.920(f), and Step Five, which concerns an adjustment to other work, 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1), is not reached.

Plaintiff alleges that the ALJ erred in finding he could return to his past, relevant work as a taxicab driver.   Specifically, plaintiff argues that the ALJ found plaintiff could not lift more than 10 pounds and was limited to sedentary work; however, the Dictionary of Occupational Titles (DOT) classifies taxicab driver as work at the Medium exertional level requiring the ability to lift up to 50 pounds occasionally.   Moreover, plaintiff argues the ALJ failed to take into consideration his sitting and standing limitations, as well as the limited range of motion in his neck.   (Doc. 19 at 17-22.)

**B.    The ALJ's RFC Determination**

The RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations."  20 C.F.R. § 404.1545(a); <u>see also</u> <u>Depover v. Barnhart</u>, 349 F.3d 563, 565 (8th Cir. 2003).  In determining plaintiff's RFC, the ALJ must engage in "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996).  An RFC determination is a medical issue, <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000), which requires consideration of supporting evidence from a medical professional.  <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).  The ALJ is required to determine plaintiff's RFC based on all the relevant evidence.  <u>See</u> <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); 20 C.F.R. §§ 404.1546, 416.946 (2001).

The ALJ found that plaintiff retained the RFC to perform work that involved mostly sitting, with occasional standing and walking limited to no more than 2 hours in an 8-hour period, and lifting no more than 10 pounds.  The ALJ determined that plaintiff's RFC coincided with that of sedentary work as described by SSA regulations. [19]

The ALJ determined plaintiff's RFC, in part, on the facts that no provider imposed a long-term driving restriction; that Dr. Carter found in his worker's compensation assessment that plaintiff could likely return to his work as a cab driver; that Dr. Bondurant told plaintiff he could return to work after spinal surgery; that plaintiff failed to

---

[19]"Sedentary work" defined by SSA regulations includes:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a); SSR 96-9P, 1996 WL 374185 at * 3 (Soc. Sec. Admin. July 2, 1996) ("Occasionally" as it relates to sedentary work is defined as "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday").

report to providers an inability to sit for prolonged periods of time; that plaintiff's daily activities belie a sitting limitation; that plaintiff failed to consistently request and take prescription pain medication; and that plaintiff's subjective complaints were not fully credible.

Plaintiff supports his position with reference to Dr. Quinlan's December 10, 2002, medical source statement. Generally, the ALJ's RFC with respect to lifting, walking, and standing is more restrictive than Dr. Quinlan's assessment. However, Dr. Quinlan opines that plaintiff cannot sit for more than 4 hours in an 8-hour in a workday, while the ALJ finds plaintiff is unlimited in his ability to sit. Moreover, Dr. Quinlan also stated that he believed plaintiff should qualify for permanent disability.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh, 222 F.3d at 452. If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion should be given controlling weight. Id. A treating physician's opinions must be considered along with the evidence as a whole and, when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight. See id.; Sampson v. Apfel, 165 F.3d 616, 618 (8th Cir. 1999). An ALJ should "give good reasons" for discounting a treating physician's opinion. Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002).

The fact that Dr. Quinlan believes that plaintiff qualifies for disability is not a medical opinion; thus, the ALJ was free to disregard Dr. Quinlan's statement in this regard. Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996) (quoting Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) ("[S]tatements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'")).

As a treating physician, the ALJ should give deference to Dr. Quinlan's position. In making his decision, the ALJ opined that Dr.

Quinlan's sitting restriction was not entitled to deference, because he did not provide clinical findings as to why plaintiff was limited in sitting. Moreover, the ALJ determined that Dr. Quinlan's findings were belied by plaintiff's ability to ride an ATV, plaintiff's statement that he felt he could return to his past work, plaintiff's consistent ability to drive an automobile, plaintiff's failure to note to providers any sitting limitations, and plaintiff's ability to sit and watch television and go the Moose Lodge. The undersigned agrees.

Before becoming his treating physician in March 2002, Dr. Quinlan evaluated plaintiff for disability in December 2001. At that time, Dr. Quinlan noted that plaintiff had no problem sitting for a prolonged period, and that he was able to drive. The only restriction Dr. Quinlan assessed was that plaintiff would be unable to perform jobs requiring standing or walking. While Dr. Quinlan did have the benefit of becoming plaintiff's treating physician after this evaluation, examining him approximately five times before his December 2002 RFC evaluation, the records do not indicate that plaintiff's medical condition deteriorated during this time period, or that he consistently complained of difficulty sitting for prolonged periods. The only intervening medical condition was his hospitalization for ascites, hepatitis B and C diagnosis, and the ATV accident, none of which appear from medical records relevant to his sitting ability, and all indicate medical improvement over time. This inconsistency in Dr. Quinlan's assessment is a potential reason to afford his opinion less deference. <u>Cf. Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies.").

Moreover, as the ALJ noted, no provider has imposed driving restrictions. Dr. Bondurant said plaintiff could return to work, Dr. Carter opined plaintiff could likely continue to drive his taxicab, and plaintiff noted to Dr. Carter that he felt he could have returned to work but did not.

Beyond his ability to sit, plaintiff notes that the ALJ failed to take into consideration Dr. Quinlan's assessment that plaintiff needed the opportunity for frequent rest breaks and that he had difficulty with

range of motion in his neck. However, medical records show that Dr. Quinlan's assessments have been inconsistent with respect to plaintiff's range of motion, finding in 2001 that plaintiff's range of motion was limited, but he could drive, and finding in 2002 that plaintiff had full range of motion in his neck after his ATV accident.

Moreover, the record does not contain any additional provider assessments that the range of motion in plaintiff's neck is so limited as to be a factor in his capacity to drive. The only reference is a "Patient Excuse" document signed by Dr. Bondurant that plaintiff could return to work after his diagnosis of central cord syndrome on June 1, 1998, but that he must not lift more than 25 pounds and use his side and rearview mirrors while driving. (Tr. 372.) Similarly, with the exception of Dr. Quinlan's December 2002 medical source statement and plaintiff's self-reports, the record does not contain any evidence or restriction requiring plaintiff have frequent rest breaks from sitting. See Miles v. Barnhart, 374 F.3d 694, 700 (8th Cir. 2004) ("[I]n assessing RFC, an ALJ must consider all the record evidence."); see also Sampson, 165 F.3d at 618 ("[A] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion itself.").

In his claimant questionnaire, plaintiff reports the inability to sit for extended periods due to numbness. Furthermore, he testified at the hearing that he experiences pain after sitting for prolonged periods, and he noted one time to Dr. Carter that his lower back pain is made worse by prolonged sitting. Reviewing these subjective complaints, the ALJ found they were not credible. The undersigned finds the ALJ's assessment was not in error.

Assessing a claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003); Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). In Singh, the Eighth Circuit held that an ALJ who rejects subjective complaints (of pain) must make an express credibility determination explaining the reasons for discrediting the complaints. Singh, 222 F.3d at 452.

The Eighth Circuit held in Polaski v. Heckler that an ALJ cannot reject subjective complaints of pain based solely on the lack of medical

support, but instead must consider various factors.  739 F.2d 1320, 1322 (8th Cir. 1984).  The factors include, in part, observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  Id.

While plaintiff reports pain and discomfort while sitting for extended periods, the record shows he does not take prescription pain medication, has taken prescription pain medication for only a limited time in the past, and has not routinely requested pain medication.  See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("The failure to request pain medication is an appropriate consideration when assessing the credibility of a claimant's complaints of pain."); Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994) ("[A] claimant's failure to take strong pain medication is "inconsistent with subjective complaints of disabling pain.")).

Plaintiff reports difficulty affording medication.  Dover v. Bowen, 784 F.2d 335, 337 (8th Cir. 1986) ("[T]he ALJ must consider a claimant's allegation that he has not sought medical treatment or used medications because of a lack of finances."); see also Hutsell v. Sullivan, 892 F.2d 747, 751 n.2 (8th Cir. 1989) ("It is for the ALJ in the first instance to determine a claimant's real motivation for failing to follow prescribed treatment or seek medical attention.").  However, he is able to afford cigarettes and alcohol, and the record fails to indicate that he has attempted to find low-cost resources or been turned down from receiving medication.  Moreover, plaintiff testified at the hearing that he has Medicaid benefits.  See Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related an inability to afford prescriptions to his provider and was denied the prescription); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) ("Although [plaintiff] claims he could not afford such medication, there is no evidence to suggest that he sought any treatment

offered to indigents or chose to forgo smoking three packs of cigarettes a day to help finance pain medication."); Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992) (noting that financial hardships can be considered in determining whether to award benefits; however, that is not of itself determinative. The court found compelling that plaintiff presented no evidence she sought out low-cost medical treatment, or was denied treatment due to lack of finances).

With respect to activities of daily living, plaintiff notes that he routinely drives. Additionally, plaintiff reports going to the Moose Lodge to play games and visit friends, as well as going on a camping trip and riding ATVs. Moreover, with the exception of limited instances, plaintiff has reported no pain, discomfort, or difficulty upon sitting for a prolonged period of time to any treatment provider. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence.").

It is not within the undersigned's authority to redetermine plaintiff's credibility. As long as there is substantial evidence in the record, the ALJ's decision will be upheld even if substantial evidence exists adverse to the ALJ's findings. See Krogmeier, 294 F.3d at 1022; Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) ("ALJs must seriously consider a claimant's testimony about pain, even when . . . subjective. But questions of credibility are for the trier of fact in the first instance. If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment."); cf. Orrick v. Sullivan, 966 F.2d 368, 372 (8th Cir. 1992) (quoting Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992) (quoting Benskin, 830 F.2d at 883 ("No one, including the ALJ, disputes that plaintiff has pain . . . . The question is 'whether she is fully credible when she claims that her back hurts so much that it prevents her from engaging in her prior work.'"))).

## C.  Plaintiff's Ability to Return to Past, Relevant Work

Having determined the ALJ's RFC determination was supported by substantial evidence, the undersigned turns to the ALJ's finding that plaintiff can return to his past, relevant work.

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit. Sufficient documentation will be obtained to support the decision. Any case requiring consideration of [past, relevant work] will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).
>
> Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source. Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience.

SSR 82-62, 1982 WL 31386, *3 (Soc. Sec. Admin. 1982). Plaintiff himself is the primary source for the requirements and demands of his past, relevant work. _See_ _id._ ("The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work.").

In this case, plaintiff reported that his past work as a taxicab driver, as he performed it, did not require him to lift more than 10 pounds, required 9 hours of sitting, required 1 hour of writing, typing or handling small objects, involved no standing, walking, climbing, kneeling, crouching or crawling, or handling, grabbing or grasping big objects.

The ALJ took notice of plaintiff's description, and the fact that plaintiff's RFC would not prevent him from working as a taxicab driver

in the same manner he had previously.  To this end, plaintiff's argument is without merit, as the ALJ was not required to consult the DOT for the exertional requirements of a taxicab driver if he had an adequate description related to the actual, functional demands of plaintiff's previous work.  See 20 C.F.R. § 404.1520(e); SSR 82-61, 1982 WL 31387 at *2 (Soc. Sec. Admin. 1982) (emphasis added) ("A claimant will be found to be 'not disabled' when it is determined that he or she retains the RFC to perform: 1. *The actual functional demands and job duties of a particular past relevant job . . . .*"; see also Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996) (citing SSR 82-61).

Plaintiff's self-report provided the ALJ with particular details related to the rigors of his past work and, as aforementioned, his statements are generally sufficient to constitute findings of past, relevant work.  Accordingly, the ALJ did not err in concluding plaintiff could return to his past, relevant work given his assessed RFC.

## RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 23, 2005.